IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

**ROBERT HOOVER,** )
**on behalf of Karen Hoover, deceased,** )
)
       Plaintiff, )
v. ) **Civil No. 10-832-JPG-CJP**
)
**MICHAEL J. ASTRUE,** )
**Commissioner of Social Security,** )
)
       Defendant. )

## REPORT and RECOMMENDATION

This Report and Recommendation is respectfully submitted to District Judge J. Phil Gilbert pursuant to **28 U.S.C. § 636(b)(1)(B)**.

In accordance with **42 U.S.C. § 405(g)**, plaintiff Robert Hoover, on behalf of his deceased with Karen Hoover, seeks judicial review of the final agency decision finding that Mrs. Hoover was not disabled and denying her Disability Insurance Benefits (DIB).

## Procedural History

Karen Hoover ("claimant") filed an application for DIB in June, 2007, alleging disability beginning on May 3, 2007. (Tr. 14). After the application was denied initially and on reconsideration, a hearing was held before Administrative Law Judge (ALJ) Robert G. O"Blennis. (Tr. 22). ALJ O"Blennis denied the application for benefits in a decision dated September 8, 2009. (Tr. 14). The Appeals Council denied review, and this decision became the final agency decision. (Tr. 1).

After the hearing, but before the ALJ issued his decision, Mrs. Hoover passed away, and Mr. Hoover was substituted as a party. (Tr. 129-132).

Administrative remedies were exhausted and a timely complaint was filed.

## Issues Raised by Plaintiff

Mr. Hoover raises the following points:

1. The ALJ erred in his consideration of the medical evidence in that he gave "great weight " to the opinions of Drs. Singh and Choi, but failed to consider limitations assessed by those treating doctors.

2. The ALJ failed to fully develop the record by obtaining evidence to show that Mrs. Hoover died from coronary artery disease, which was one of impairments the ALJ found her to have.

3. The ALJ failed to ask the vocational expert ("VE") whether his testimony conflicted with the *Dictionary of Occupational Titles*.

## **Applicable Legal Standards**

In order to receive DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, a person is disabled when he or she has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §§ 423(d)(1)(A).** A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §§ 423(d)(3).**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. It must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. **See,** *Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992);** *Pope v. Shalala*, **998 F.2d 473, 477 (7th Cir. 1993); 20 C.F.R. § 404.1520(b-f).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step

four), the burden shifts to the Secretary at step five to show that the claimant can perform some other job. ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984).** The Commissioner's burden at step five is to show that there are a significant number of jobs in the economy that claimant is capable of performing. **See, *Bowen v. Yuckert*, 482 U.S. 137, 146, 107 S. Ct. 2287, 2294 (1987); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).**

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. The scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether Mrs. Hoover was, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)**). This Court uses the Supreme Court's definition of substantial evidence, i.e, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richard v. Perales*, 402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).** However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

ALJ O'Blennis followed the five-step analytical framework described above. He determined that Mrs. Hoover had not been engaged in substantial gainful activity since the alleged onset date. He found that she had severe impairments of coronary artery disease,

-3-

residuals of below-the-knee amputation, chronic obstructive pulmonary disease and hypertension. He found that her condition did not meet or equal a listed impairment. The ALJ found that Mrs. Hoover had the residual functional capacity (RFC) to perform a limited range of work at the sedentary exertional level. A vocational expert (VE) testified that she was able to perform the jobs of hand packer and assembler, which exist in significant numbers in the economy. The ALJ accepted this testimony and found that plaintiff could perform those jobs and was therefore not disabled. (Tr. 14-21).

### The Evidentiary Record

The Court has reviewed and considered the entire record in formulating this Report and Recommendation. The following is a summary of some of the pertinent portions of the written record. As Mrs. Hoover's insured status expired on December 31, 2007, the Court will not set forth a detailed discussion of the medical evidence after that date.

**1.     Agency Forms**

Mrs. Hoover was born in 1960, and was almost 47 years old when she allegedly became disabled. (Tr. 133). She stopped working in May, 2007, after her right leg was amputated. (Tr. 138). She had worked as a shipping clerk and a folder operator. (Tr. 139).

She was insured for DIB through December 31, 2007. (Tr. 122).

**2.     Evidentiary Hearing**

Mrs. Hoover was represented by counsel at the hearing on July 8, 2009. (Tr. 24).

Mrs. Hoover testified that she lived with her husband and two children, aged 17 and 12. She left school in the 10th grade, and did not get a GED. (Tr. 27). She last worked for a theatrical supply company, filling orders, stocking shelves and doing inventory. (Tr. 28). She had a heart attack in May of 2007. She developed gangrene in her right foot, leading to the amputation of her right leg below the knee. (Tr. 30-31).

She testified that, during the day, she made her own meals, dusted, did laundry and vacuumed. She left the house to go to the doctor and the store. (Tr. 36). She drove the short distance to the grocery store, and her daughter helped her shop. (Tr. 38). She attended her children's school functions. (Tr. 48). She removed her prosthetic leg and used her left foot to drive. (Tr. 51).

Mrs. Hoover testified that she could stand for 20 minutes and sit for 15 minutes. (Tr. 41-42). She was unable to lift a gallon of milk. (Tr. 43).

Dr. Dale Taylor testified as a vocational expert (VE). The ALJ asked him to assume a person who was able to lift less than 10 pounds frequently, stand/walk for 2 hours a day, sit for 6 hours a day, no foot controls, avoid climbing of ladders, ropes or scaffolds, and only occasional postural activities. The VE testified that she would not be able to do plaintiff's past work. However, she would be able to do the jobs of hand packer and assembler, which are unskilled and sedentary. (Tr. 59-60). These jobs exist in significant numbers in the local economy. (Tr. 60).

### 3.     **Medical Records up to date last insured**

Mrs. Hoover was admitted to Gateway Regional Medical Center in Granite City, Illinois, on May 2, 2007. She had presented to the emergency room with weakness and near syncope. A drug screen was positive for cocaine. She complained of chest pain, and her cardiac enzymes were elevated. Cardiac catheterization was done, with placement of a stent in the right coronary artery. She was discharged to home on May 4, 2007. (Tr. 222-223).

Mr. Hoover took his wife back to the hospital on May 8, 2007, as she was unresponsive. She had been drinking alcohol and had not been taking the medications that had been prescribed when she was discharged a few days earlier. (Tr. 204). She had a number of problems, including alcohol and cocaine abuse, hematoma on the groin, a discolored right toe and sepsis. It was felt that she had contracted an infection related to the cardiac catheterization. (Tr. 211-

214). She was treated with antibiotics, but her right big toe became gangrenous and was amputated. She developed cellulitis in the right foot, and amputation of the foot was recommended. She left the hospital against medical advice on May 22, 2007, to get a second opinion. (Tr. 203-205).

Dr. Eric Choi did a below-the-knee amputation of the right leg at Barnes Jewish Hospital in St. Louis, Missouri, on June 6, 2007. (Tr. 234-235). She was transferred to the Rehabilitation Institute of St. Louis on June 12, 2007, but was taken back to Barnes Jewish because of chest pains and shortness of breath on June 18, 2007. She was returned to the Rehabilitation Institute on June 20, 2007. (Tr. 375-376).

A pharmacologic stress test on June 19, 2007, was negative. (Tr. 341).

Upon her discharge from the Rehabilitation Institute on June 27, 2007, she was using a walker and was able to go up and down steps using a crutch and handrail. She was independent in eating, grooming and bathing, and modified independent in dressing and ambulation. (Tr. 350-351). In a follow-up visit on July 9, 2007, Dr. Choi indicated that her amputation site was "healing nicely." (Tr. 233).

On August 1, 2007, Mrs. Hoover was seen by cardiologist Michael Beardslee of Washington University School of Medicine in St. Louis, Missouri. It was noted that she had cardiac catheterization in April, 2007, which was complicated by a pseudoaneurysm and AV fistula, along with a thromboembolic event., leading to the eventual amputation of her right leg below the knee. (Tr. 337). She reported that she had been having chest pain daily since her discharge from the Rehabilitation Institute. She was reluctant to undergo another catheterization, so she was treated medically. Her Imdur was increased, and nitroglycerin was prescribed. (Tr. 338). On September 11, 2007, a nurse practitioner under Dr. Beardslee's supervision noted that Mrs. Hoover continued to have chest pain, but she had not been taking her long-acting nitrate (Imdur). She was using nitroglycerin, which relieved her pain. She was

again prescribed Imdur and instructed to begin taking it right away. She was also prescribed Chantix and counseled on the importance of quitting smoking. (Tr. 335-336).

In September, 2007, Mrs. Hoover was admitted to the Rehabilitation Institute of St. Louis for an in-patient program focused on gait training with a prosthetic leg. She was discharged after 20 days, to follow up with an occupational therapy home program and outpatient physical therapy. (Tr. 300-307). At the time of discharge, she was able to bear full weight on bilateral lower extremities. It was noted that "For activities of daily living the patient requires no assistance." (Tr. 417).

Mrs. Hoover was evaluated for outpatient physical therapy at the Rehabilitation Institute on October 2, 2007. The recommendation was for 2 therapy sessions a week for 8 to 10 weeks. (Tr. 347). However, she did not return for any therapy after the initial evaluation. (Tr. 349).

On October 2, 2007, Dr. Beardslee's nurse practitioner saw Mrs. Hoover and noted that she had been taking her isosorbide mononitrate (Imdur) and her chest pain was much better. She had only had one episode of chest pain since resuming the drug, and it was relieved with one dose of nitroglycerin. She denied shortness of breath, lightheadedness and palpitations. On examination, she had a regular heart rate and rhythm with no significant murmurs or gallops. Carotid pulses were 2+ with no bruits. Her hypertension was well-controlled. She was down to 2 or 3 cigarettes a day. She was to continue taking the current dose of Imdur. (Tr. 325-326).

There are no records of any further treatment before December 31, 2007.

**4.     Medical records after date last insured**

Dr. Choi saw Mrs. Hoover in follow-up for her amputation in February and August, 2008. He noted on both visits that her amputation site was healed and she was able to ambulate without difficulty. (Tr. 547-548).

In February, 2008, Mrs. Hoover was admitted to Barnes Jewish Hospital for chest pain. Cardiac catheterization showed severe coronary vasospasm, likely multi-vessel, and coronary

artery disease with significant blockage. She was managed medically and was to follow up with Dr. Beardslee. (Tr. 455-458).

In April, 2008, Dr. Beardslee noted that Mrs. Hoover had been feeling generally well and had only one recent episode of chest pain, which resolved with nitroglycerin. She said she had been avoiding cocaine, but still continued to "smoke excessively." The assessment was severe diffuse multi-vessel coronary spasm likely aggravated by tobacco use and cocaine use. Dr. Beardslee wrote that he "counseled her at length regarding the need to avoid both of these and she understands." He adjusted her medications. (Tr. 525-526).

**5.     Consultative examination**

Dr. Raymond Leung did a consultative exam on March 5, 2008. He noted claimant's history of below-the-knee amputation of the right leg, high blood pressure, heart attack in May, 2007, and congestive heart failure. She complained of episodes of chest pain every 2 to 3 days which were relieved by nitroglycerin. On examination, she had normal cardiac rate and rhythm, with no murmurs. Her lungs were clear to auscultation, with no rales, rhonchi or wheezes. She walked with a minimal limp, with or without her cane. The stump of her right leg was nontender. She had no spasms. She was able to tandem walk, toe walk and squat 3/4 of the way. She was not able to hop or heel walk. She could walk 50 feet unassisted. She had some limitation of the range of motion in the lumbar spine. Pinch strength, arm strength, grip strength and left leg strength were full. Right leg strength was 4+/5. (Tr. 308-315).

**6.     RFC assessments**

State agency consultant B. Rock Oh, M.D., completed a physical RFC assessment on September 9, 2007, based upon a review of the medical records. This was a projected assessment which was done before Mrs. Hoover completed her rehabilitation following her amputation. The projected assessment was that Mrs. Hoover would be able to do light work with limitations. (Tr. 236-243).

-8-

State agency consultant Julio Pardo, M.D., completed a second physical RFC assessment on March 26, 2008. Dr. Pardo reviewed additional records, including the report of Dr. Leung. Dr. Pardo concluded that Mrs. Hoover could do sedentary work, i.e., frequently lift less than 10 pounds, occasionally lift 10 pounds, stand and/or walk 2 out of 8 hours and sit for 6 out of 8 hours. See, 20 C.F.R. §404.1567(a). Her ability to push and/or pull was limited in her lower extremities. She was limited to only occasional postural activities, i.e., climbing, balancing, stooping, due to her prosthetic leg. She had no manipulative, visual or communicative limitations. She should avoid machinery and heights. (Tr. 316-323).

Dr. Choi, the surgeon who did the amputation, completed a form entitled Physician's Assessment for Social Security Disability Claim on December 10, 2008. Dr. Choi indicated that Mrs. Hoover had "Restrictions of work requiring prolonged standing (S/P RBKA) [status/post right below knee amputation] and lifting." He did not specify what those restrictions were. He also wrote that her endurance "depended on the type of work." The form sets out the regulatory definition of sedentary work, and asks whether the claimant is "capable of sustained employment at the 'sedentary work' level?" Dr. Choi responded "Yes" and wrote that "Ms. Hoover will require sedentary work...." (Tr. 546).

Dr. Toniya Singh, who treated claimant for her cardiac condition in 2009, completed a Physician's Assessment form on June 13, 2009. She stated that claimant was unable to lift more than 5 pounds and unable to do any sustained walking due to shortness of breath. She also said that Mrs. Hoover "needs to rest in [sic] less than an hour of physical activity." Below the regulatory definition of sedentary work, Dr. Singh wrote "Pt. should be able to perform sedentary work." (Tr. 610).

**7.    Death of Mrs. Hoover**

Plaintiff's attorney wrote a letter to the ALJ, dated July 15, 2009, stating that Mrs. Hoover had a massive heart attack between the hearing on July 8, 2009, and July 14, 2009. (Tr.

194-195). On August 7, 2009, counsel wrote that Mrs. Hoover lapsed into a coma after the heart attack and had passed away. (Tr. 100).

## Analysis

The period of time at issue is relatively short. Mrs. Hoover alleged that she became disabled as of May 3, 2007. She was last insured for DIB as of December 31, 2007.[1] Thus, plaintiff must establish that Mrs. Hoover became disabled on or before December 31, 2007. ***Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (citation omitted).** It is not sufficient to show that the impairment was present as of the date last insured; rather plaintiff must show that the impairment was severe enough to be disabling as of the relevant date. ***Martinez v. Astrue*, 630 F.3d 693, 699 (7th Cir. 2011)**.

Plaintiff's first point is that the ALJ erred in his consideration of the opinions of Drs. Choi and Singh regarding Mrs. Hoover's ability to do sedentary work. Both doctors completed Physician's Assessment forms, described above. The ALJ said that he gave "great weight" to the opinions of these doctors that Mrs. Hoover could do sedentary work. See, Tr. 19. Mr. Hoover argues that the ALJ erred in that he did not accept the additional limitations set forth by these doctors.

It is true that an ALJ errs when he selectively discusses a doctor's report, ignoring the parts that conflict with his decision. ***Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000).** However, that is not what ALJ O'Blennis did here. The form completed by both doctors explained the requirements of sedentary work as follows:

> work that involves lifting no more than 10 pounds at a time along with occasional lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is performed primarily in a seated position, a certain amount of walking and standing is often necessary in carrying out job duties.

---

[1]The ALJ first gave her last insured date as September 30, 2007 at Tr. 14, but later said she was insured through December 31, 2007, at Tr. 21. Citing to Tr. 122, the Commissioner states in his brief that she was insured through December 31, 2007. See, Doc. 25, p. 15. The Court will therefore use the later date.

Tr. 546, 610.

Immediately after that explanation, the form asked whether, in view of all of the patient's combined impairments, she is "capable of sustained employment at the 'sedentary work' level." Both Drs. Choi and Singh responded that Mrs. Hoover was capable of sedentary work. (Tr. 546, 610).

Plaintiff argues that the ALJ ignored additional limitations assessed by Dr. Singh in that Dr. Singh wrote that Mrs. Hoover could not lift over 5 pounds and that she needed to rest "in [sic] less than an hour of physical activity." Plaintiff's argument fails.

There is an apparent conflict in the form filled out by Dr. Singh in that she first indicated that Mrs. Hoover could not lift over 5 pounds, and then she wrote that Mrs. Hoover could do sedentary work even though sedentary work requires occasional lifting of "no more than 10 pounds." The other point, that Mrs. Hoover would have to rest after an hour of physical activity, is more ambiguous. It may be that Dr. Singh was referring to physical activity more strenuous than sedentary work. Regardless, Dr. Singh clearly opined that Mrs. Hoover was able to do sedentary work after having been informed of the requirements of such work.

It certainly would have been better if the ALJ had explained why he rejected the suggestion that Mrs. Hoover was limited to lifting only 5 pounds and needed to rest after an hour of activity. However, even if the ALJ erred in to doing so, any such error was harmless.

An ALJ's error is harmless where, having looked at the evidence in the record, the court "can predict with great confidence what the result on remand will be." ***McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011)**. In ***McKinzey***, the ALJ erred in not discussing the opinion of a state agency physician. However, the Seventh Circuit held that the error was harmless because "no reasonable ALJ would reach a contrary decision on remand" based on that opinion. ***McKinzey, Ibid***.

Here, no reasonable ALJ would reach a contrary decision on remand based on Dr.

-11-

Singh's opinion because it appears that Dr. Singh saw Mrs. Hoover for the first time in February, 2009, more than a year after the date last insured. She reviewed some earlier medical records from Barnes Jewish Hospital, but those records were from 2008. See, Tr. 620. Dr. Singh filled out the Physician's Assessment on June 13, 2009. The statements in the form are all in the present tense, i.e, as of June, 2009, and do not purport to assess Mrs. Hoover's abilities as of the date last insured. Therefore, regardless of whether Dr. Singh intended to express limitations on Mrs. Hoover's ability to do sedentary work in June, 2009, no reasonable ALJ would reach a different conclusion as to whether Mrs. Hoover was disabled as of December, 2007, based on Dr. Singh's opinion. "It would serve no purpose to remand this case to the ALJ for a statement of the obvious." **McKinzey, Ibid**.

Plaintiff's argument with respect to Dr. Choi is even weaker. Dr. Choi also completed the Physician's Assessment after the date last insured, but he did treat Mrs. Hoover before that date. However, Dr. Choi did not assess any limitations that would be incompatible with sedentary work. He wrote that she was restricted as to prolonged standing and lifting, and that her endurance would depend on the type of work she did, but those statements do not conflict with the statement that she was able to do sedentary work. The ALJ did not err in his discussion of Dr. Choi's opinion.

Plaintiff's second point is that the ALJ should have fully developed the record by obtaining a copy of the death certificate to establish that the cause of death was a heart attack. However, the ALJ had been informed by counsel that Mrs. Hoover had a heart attack. In any event, this information is irrelevant to the critical inquiry here. The fact that Mrs. Hoover died of a heart attack in 2009 does not establish that she was disabled as of December 31, 2007. There was no reason for the ALJ to obtain a copy of the death certificate.

Lastly, Mr. Hoover argues that the ALJ erred in failing to ask the VE whether his testimony was consistent with the *Dictionary of Occupational Titles*.

SSR 00-4p requires the ALJ to ask whether a VE's testimony "conflicts with information provided in the DOT."[2] If there is an "apparent conflict" with the DOT, the ALJ must obtain an explanation of the conflict. See, **Overman v. Astrue, 546 F.3d 456, 462-463 (7th Cir. 2008)**.

Here, the ALJ did not literally ask about a "conflict". After the VE testified that the hypothetical person could do the jobs of hand packer and assembler, which he said are sedentary and unskilled, the ALJ asked him whether those jobs are "described in" the DOT. The VE testified, "Yes under the census code there's several DOTs within each one of these categories." (Tr. 60). In his decision, the ALJ said that the VE's testimony was consistent with the DOT. (Tr. 21).

Arguably, the ALJ discharged his duty to enquire about conflicts with the DOT. It appears that the VE understood that this was the thrust of his question. However, even if the ALJ had not asked about the DOT at all, there would be no error here.

An ALJ's failure to ask about a conflict is harmless if there is no actual conflict with the DOT. **Terry v. Astrue, 580 F.3d 471, 478 (7th Cir. 2009).** Plaintiff's brief suggests that hand packer is not a sedentary position according to the DOT. However, ss the Commissioner explains in his brief, the DOT lists several assembler positions which are sedentary and unskilled. See, Doc. 25, p. 16. Thus, the VE's testimony about the assembler position, at least, does not conflict with the DOT. According to the VE's testimony, there are 6000 assembler positions in Illinois, which is a significant number. The evidence regarding the assembler position alone was sufficient to support the ALJ's findings at step 5.

Further, the ALJ's duty to enquire further is triggered only where the conflict between

---

[2]Social Security Rulings "are interpretive rules intended to offer guidance to agency adjudicators." **Lauer v. Apfel, 169 F.3d 489, 492 (7th Cir. 1999)**. Social Security Rulings are "binding on all components of the Social Security Administration." **20 C.F.R. § 402.35(b)(1)**. They do not, however, "have the force of law or properly promulgated notice and comment regulations." **Lauer, id.**

the VE's testimony and the DOT is "apparent." Where, as here, claimant did not identify any conflict at the hearing, the conflict is regarded as apparent only where it was "obvious enough that the ALJ should have picked up on [it] without any assistance." **Terry v. Astrue**, **580 F.3d at 478, citing** **Overman v. Astrue**, **546 F.3d at 463**. Any conflict here between the VE's testimony that the hand packer position was sedentary and the DOT requirements of that job was not so obvious that the ALJ should have picked up on it at the hearing.

## Recommendation

After careful consideration, this Court is convinced that the decision of the ALJ is supported by substantial evidence in the record as a whole, and that no errors of law were made. Therefore, this Court recommends that the final decision of the Commissioner of Social Security, finding that claimant Karen Hoover was not disabled as of December 31, 2007, be **AFFIRMED.**

Objections to this Report and Recommendation must be filed on or before **January 23, 2012.**

**Submitted: January 6, 2012.**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**UNITED STATES MAGISTRATE JUDGE**
